12522

DAVIS *ET AL.* v. TOWN OF SALUDA *ET AL.*

(145 S. E., 412)

May, 1928.

The order of Judge DeVore follows: ·

An election was held in the town of Saluda, this State, September 19, 1927, for the purpose of submitting to the qualified voters of said town the questions of (1) establishing a waterworks system and issuing $100,000 of bonds therefor; and (2) establishing a sewer system and issuing $75,000 of bonds for that purpose. The result of the election was as follows: For waterworks and bonds therefor 232 votes, against 35 votes; and for sewer system and bonds therefor 231 votes, against 33 votes. If the result of the election is an approximate indication of the sentiment of the community, then undoubtedly the overwhelming opinion of the citizens of the town is in favor of establishing both systems and issuing bonds for their construction.

This proceeding challenges the validity of this election, and the immediate question before me is: Should a restraining order be issued to enjoin the issuance and sale of said bonds during the pendency of this action?

The plaintiffs brought this action asking a permanent injunction against the issuance and sale of said bonds, alleging that the election, which apparently authorized the same, is null and void for the following reasons:

(a) Few of the voters at said election held county registration certificates.

(b) The supervisor of registration for the town did not take the oath of officer required by law, and he allowed other persons who had not taken the oath to act for him at times in issuing town registration certificates.

(c) A number were allowed to vote in the election who had not paid 1926 taxes.

(d) Voters were not required to produce registration certificates and tax receipts at the time of voting.

(e) Amount of bonds proposed by said election exceeds 8 per cent. of the assessed value of property for taxation, and is contrary to the Constitution.

(f) Amount of bonds proposed exceeds 15 per cent. of assessed value of property, and is contrary to the Constitution.

(g) Less than 10 per cent. of the voters produced county registration certificates and tax receipts to obtain municipal registration certificates.

(h) The issuance of the proposed bonds will amount to a confiscation of property within the town and a taking thereof without due process of law, in violation of the State and Federal Constitutions.

(i) The amendments to the State Constitution removing the limitations on the amount of bonds that may be issued by the town for the establishment of water and sewer systems are invalid, null and void.

The allegations of the complaint are stated generally, and it was upon them that an order was heretofore passed by Judge Mauldin requiring the defendants to show cause before me why an injunction should not be issued restraining the defendants during the pendency of this litigation from issuing and selling the bonds voted in said election.

Have the plaintiffs established a *prima facie* case entitling them to an injunction during the litigation? I will first consider the grave constitutional questions raised in the complaint. The contention of the plaintiffs is that neither Section 7 of Article 8, nor Section 5 of Article 10 of the Constitution has been amended to lift the limitation on the amount of bonds that may be issued by the town to establish water and sewer systems. There are printed, in Volume 1 of the Code of 1922, numerous amendments to the Constitution which seem to lift the limitation imposed upon municipal corporations in the issuance of bonds to be applied solely and exclusively to the purchase, establishment, and maintenance of a waterworks plant or sewerage system, etc. The General Assembly passed a joint resolution, which was approved the 28th day of February, 1910 (26 St. at Large, p. 1055), submitting to the qualified electors of the State in the general election of that year, an amendment to Section 7 of Article 8 of the Constitution, by adding a proviso thereto, in the following words:

"*Provided, further,* That the limitations imposed by this Section and by Section 5, of Article X, of this Constitution, shall not apply to the bonded indebtedness in and by any municipal corporation when the proceeds of said bonds are applied solely and exclusively for the purchase, establishment and maintenance of a water works plant, or sewerage system, or lighting plant, and when the question of incurring such indebtedness is submitted to the freeholders and qualified voters of such municipality, as provided in the Constitution upon the question of other bonded indebtedness."

At the 1911 session of the General Assembly, an act was duly passed ratifying amendment to the Constitution which had been submitted to the voters in 1910 (No. 8, Acts of 1911, p. 13), reciting as a fact that a majority of the electors qualified to vote for members of the General Assembly, voting on said amendment at the next succeeding election after the passage of said resolution, had voted in favor of said amendment.

Attorneys for plaintiffs argued with great force and earnestness that this amendment and other amendments to which reference will be made later, could not have the effect of changing the limitation of 15 per cent. imposed in Section 5 of Article 10 of the Constitution, for the reason that the amendment adopted was an addition to Section 7 of Article 8 of the Constitution, and could not control the 15 per cent. limitation therefore adopted in Section 5 of Article 10. A careful consideration of the matter convinces me that this point is disposed of by the case of *Seegers v. Gibbes,* 72 S. C., 545, 52 S. E., 586. In that case an amendment to Section 7 of Article 8, which was satisfied by an Act of the Legislature approved February 8, 1901 (23 Stat., 616), was attacked on the ground that it did not lift the fifteen per cent. limitation imposed in Section 5 of Article 10. That amendment, in part, was as follows:

"Provided, that the limitation imposed by this section [Section 7 of Article 8] and by Section 5, Article 4, of this Constitution, shall not apply to bonded indebtedness incurred by the cities of Columbia," etc.

Since Section 5 of Article 4 of the Constitution had no relation to the subject being dealt with, it was clearly apparent that there was an error in the wording of the act ratifying the amendment, that it was intended to read "Article 10" instead of "Article 4," which first-mentioned article contains the limitation of 15 per cent. on the aggregate bonded debt of municipalities. After stating that the amount of the bonds proposed to be issued would be in excess of the 15

per cent. limitation, the Court had this to say: "But for the unfortunate slip in making the amendment of Feb. 8, 1901, already quoted, apply to Section 5, Article 4, which relates to an entirely different subject, instead of to Section 5, Article 10, this question could not arise, for 'the limitation' " removed as to the amount of the bonded debt of the city of Columbia and other cities mentioned would have referred obviously to the 15 per cent. limitation, as well as to the 8 per cent. limitation, both being mentioned in that section. It must be confessed this mistake has given rise to doubt and confusion. The amendment by its terms, nevertheless, removed the 8 per cent. limitation as to the cities mentioned, because that limitation is provided in Section 7, Article 8, which is expressly referred to in the amendment, and hence Section 5, Article 10, was inconsistent with the amendment, as far as it provided for an 8 per cent. limitation, and this 8 per cent. limitation there repeated necessarily was also taken away. *Bray v. City Council of Florence,* 62 S. C., 57, 39 S. E., 810.

"It is true, the fifteen per cent. limitation might operate without the eight per cent. limitation, but the terms of Section 5, Article 10, under discussion, indicated these limitations were intended to operate together, the former to be a restriction on the latter, and hence we think the reasonable view is that they fell together. If the fifteen per cent. limitation should be held in force, notwithstanding the repeal of the eight per cent. limitation, the result would be that one municipal corporation could be contracting a bonded indebtedness amounting to fifteen per cent. of its taxable property, exclude another municipal corporation or political division of the State limited to the same territory from incurring any bonded indebtedness whatever, however great may be the necessity. To illustrate: A city coterminous with a school district might issue bonds to the amount of fifteen per cent. of the taxable property of the common territory, and thus forever prevent the issue of the bonds

by the school district, though the necessity might be ever so great. The repeal of the eight per cent. limitation defeated the original constitution scheme as to the cities mentioned for the limitation of municipal indebtedness, of which the fifteen per cent. limitation was a part, even, however if it be considered the mistake in the enactment of the constitutional amendment make this question a knot which cannot be untied, in cutting it we have effected the manifest purpose that the amendment was intended to serve.

"I have carefully considered the case of *Welch v. Getzen,* 85 S. C., 156, 67 S. E., 294, cited on behalf of the plaintiffs, but I do not see that it in any way modifies the law as declared in *Seegers v. Gibbes, supra,* even if it has any bearing on the point at issue at all.

"Again, I find that another amendment to Section 7 of Article 8 of the Constitution was ratified by the General Assembly January 30, 1917. (The 30 Stat., 224) ; and this amendment specifically states that the limitation imposed by this section and by Section 5 of Article 10 of the Constitution shall not apply to bondedness in and by any municipal corporation when the proceeds of the bonds are applied solely and exclusively for the purchase, establishment and maintenance of the water work plant or sewerage system," etc.

A third amendment to the Constitution was adopted by the General Assembly February 11, 1921 (32 Stat., 29) which is in practically the same language as that already quoted.

In 1921, still another amendment to the Constitution was ratified by the Legislature (32 Stat., 68), which has direct application to the defendant, Town of Saluda, and it reads as follows:

*"Provided, further,* That the limitations imposed by this section and Section 5 of Article 10 of the Constitution of the State of South Carolina, shall not apply to the bonded indebtedness of the Towns of Saluda, in Saluda County,

and Kingstree, Williamsburg County, when the proceeds of such bonds are applied exclusively to the building, erecting, establishing, repairing, extending or maintaining of sidewalks, streets, water works, lighting plants, sewerage system, fire department or Town Hall and guard house for such town, or for any or either of such purposes, or for the payment of any indebtedness already incurred for any or either of such purposes, and when the question of incurring such bonded indebtedness is submitted to the qualified electors of said municipalities by the Town Council of said towns, a majority of those voting in said election or elections shall vote in favor thereof."

It seems to me that, in the light of the decision of the Supreme Court of *Seegers v. Gibbes, supra,* there can no longer be any question as to the validity of the several constitutional amendments heretofore duly adopted lifting the limitation on the amount of bonded debt that may be assumed by a municipal corporation in the manner provided by law for the purpose of establishing water or sewerage system therein. Hence I hold as a matter of law that there is no constitutional or statute limit on the amount of bonds that may be issued by the municipal corporation for the purpose of establishing either a water or sewerage system, or both.

I will take up the points made by plaintiffs in the order stated above, excluding the constitutional question already considered, to wit:

(a) *Few Voters Had County Registration Certificates.*—About 116 of the voters participating in said election filed affidavits setting forth that they held county registration certificates at the time of the said election; and, in addition, there is an affidavit made by W. N. Padgett, H. B. Hare, J. W. Chadwick, and T. D. Fulmer, reputable citizens of Saluda, stating that they checked the books of registration for Saluda county against the polls list in said election and found that 162 of those participat-

ing in the election had county registration certificates. There is nothing to contradict the sworn testimony, except the verification of the complaint, made on information and belief, without stating the sources of the information or the grounds of the belief. *Pickman v. Georgetown,* 130 S. C., 18, 125 S. E., 191. If 162 voters voted on county certificates and only 35 of those participating in the election voted in the negative, it follows as a necessary conclusion that there were not enough illegal votes cast to have affected the result thereof.

(b) *Town Registrar Did Not Take Oath, etc.*— ██ This point, it seems to me, is disposed of by the case of the *State v. Coleman,* 54 S. C., 282, 32 S. E., 406. It is not disputed that the gentleman acting as supervisor of registration for the town had been performing the duties of this office for a long time, and that preceding this election he was holding the office and acting in the capacity of registrar for the town. In the absence of a showing of fraud, I hold that he was at least a *de facto* officer, and that his failure to subscribe to the required oath of office, upon his last appointment, will not vitiate the election. Nor do I think that the mere fact that he had others assisting him in the clerical work of issuing registration certificates will affect the validity of the registration certificates issued by him and in his name as supervisor of registration for the town, unless there was some showing of fraud in connection therewith. It is a well-recognized fact that officers frequently have to engage the service of others to assist them in the performance of their official duties, and that fact alone will not void their official acts.

(c) *A Number of Voters Had Not Paid 1926 Taxes.*— This allegation is supported only by the verification to the complaint, which is made upon information and belief, without stating the sources of the information or the ground of belief. On the other hand, an affidavit was filed on this hearing, signed by four reputable and outstanding gentle-

men of the town of Saluda, stating that they had checked the poll list of said election against the county tax books and the town tax books and found that of those participating in said election 250 had paid all county and State taxes and 252 all town taxes charged against them for the preceding year. If this is true, and there seems to be no reason to doubt the statement, the few participating in said election who had not paid their taxes could not have affected the result. The return of the managers shows that 232 voted in favor of the proposal to issue bonds and 35 against it. Hence, I find that, after deducting all votes that could have been challenged on this ground, there is still an overwhelming majority in favor of the issuance of the bonds.

(d) *Voters Not Required to Produce Registration Certificates and Tax Receipts at Polls.*—Article 2 of the Constitution deals with the right of suffrage. The first section provides that all elections shall be by ballot; the second fixes the qualifications for office; the third declares who shall be electors; the fourth supplies the qualifications for suffrage, including residence, registration every ten years, the payment of taxes, the certificates of registration, etc.; the fifth provides a remedy for those denied registration; the sixth declares who shall be disqualified from registering and voting; the seventh defines residence; and the eighth provides for the appointment of a registration board for each county and the opening of the books of registration; the ninth relates to polling precincts; the tenth to primary elections; and the eleventh to the closing of the books of registration. These first eleven sections of Article 2 of the Constitution relate primarily to State or county elections as distinguished from town elections. Immediately following these sections, we have Section 12, which provides as follows:

"*Municipal Elections—Registration in.*—Electors in municipal elections shall possess the qualifications and be

subject to the disqualifications herein prescribed. The pro-
duction of a certificate of registration from the registration
officers of the county as an elector at a precinct included in
the incorporated city or town in which the voter" resides
"is declared a condition prerequisite to his obtaining a cer-
tificate of registration for municipal elections, and in addi-
tion he must have been a resident within the corporate limits
at least four months before the election and have paid all
taxes due and collectible for the preceding fiscal year. The
General Assembly shall provide for the registration of all
voters before each election in municipalities : *Provided,*
That nothing herein contained shall apply to any municipal
elections which may be held prior to the general election
of the year 1896."

It will be noted that this section says that "electors in
municipal elections shall possess the qualifications and
be subject to the disqualifications *herein* prescribed."
It is undoubtedly true that, before a person can
vote in either State, county, or town elections, he must
show, among other things, that he has paid all taxes as-
stitution providing for town elections does not specifically
say before whom he shall make the showing, and much,
therefore, is left to be supplied by the Legislature in giving
force and effect to the constitutional provisions.

The sections of the Constitution just quoted prescribe
as a prerequisite to procuring a certificate of registration
for municipal elections that the applicant shall show (1)
he has a certificate of registration from the registration offi-
cers of the county; (2) that he has been a resident within
the corporate limits of the town for at least four months
before the election; and (3) that he has paid all taxes due
and collectible for the preceding fiscal year. The very lan-
guage of this section that framers of the Constitution in-
tended that the showing of a county registration certificate,
residence, and the payment of taxes should be made before
a town registration officer and not before the managers of

election, Section 222, Vol. 3, of the Code of Laws of 1922, contains substantially the same provisions that are in Section 12 of Art. 2 of the Constitution. Construing the statutory provisions relating to municipal elections and Sec. 222 of the Code together, it appears that the intention of the law was to prescribe different regulations for the conduct of town elections to those fixed for county and state elections, and that one of the differences is that the law requires a showing of the payment of all taxes due to be made before the town registration officer in the case of municipal elections, while the same showing is required to be made before the managers of election in case of county and State elections. The reason for this difference is manifest. In the case of county and State elections, registration holds good for ten-year period, while in municipal elections it is only good for two years at the most. Section 221 of the Code relating to ordinary State and county elections requires that a voter must produce a registration certificate before he will be allowed to vote, even though his name appears on the book of registration. Yet in Section 228 of the Code, which relates exclusively to the conduct of municipal elections, it is provided that "no elector shall be allowed to vote in any municipal election whose name is not registered as herein provided, or who does not produce a municipal registration certificate at the polls." This would indicate that if a voter's name is on the registration books it is not necessary for him to produce a municipal registration certificate. And since the law requires that all applicants for registration in municipal elections shall hold county registration certificates and shall offer proof of the payment of all taxes due and collectible against him for the preceding year, it would seem both illogical and unreasonable to require that he make the same proof before the managers of election when there had been no intervening tax period as in this case. To hold otherwise would be to assume that the makers of the Constitution and the General

Assembly intended to require persons participating in town elections to produce proof of the same fact twice.

Besides 116 of the voters participating in said election filed an affidavit, stating that at the time they presented themselves to the managers of the election to vote in said election they had in their possession a town registration certificate and were prepared to offer proof of the payment of all taxes for the preceding year, and that the only reason they did not produce said registration certificates and proof of the payment of taxes was that the managers of election did not require it.

As stated in *Rawl v. McCown,* 97 S. C., 9, 81 S. E., 961:

"These provisions of the law are directed to the officers who are entrusted with its administration, and not to those who apply for registration, unless they are guilty of a fraudulent participation in violating them. It would be unreasonable and unjust to deny to honest electors, who complied with the law, and those who were ready and willing to comply with it, their constitutional right of suffrage on account of the fraud, caprice, ignorance or neglect of duty of the registration officers."

If all of the votes should be disregarded except the 116 that are shown to have all the qualifications required for voting, the result of the election would not be affected. Allowing those opposed to the bond issue their full number of 35 votes, there would still remain 81 legal votes in favor of the issuance of bonds.

(g) *Not 10 Per Cent. of Voters Produced County Registration Certificates and Tax Receipts to Obtain Municipal Registration Certificates.*—This point seems to be conclusively disposed of in the case of *Rawl v. McCown, supra.* After reciting the various constitutional and statutory provisions relating to the registration of voters, the Court had this to say:

"These provisions of the law make manifest the intention that registration by the proper officers is conclusive evi-

dence of the qualifications of the elector therefor, until reversed or set aside in the manner prescribed, for which ample time and opportunity is allowed. This does not mean that registration alone, or the possession of a registration certificate, entitles the holder thereof to vote. A registered elector may be denied the right to vote on numerous grounds; as, for example, if he was registered within thirty days of the election (*Gunter v. Gayden,* 84 S. C., 48, 65 S. E., 948), or if, since his registration, he has removed his residence from the county, or his precinct, or has been convicted of a disqualifying offense, and for other causes. It means only that registration concludes collateral inquiry into the qualification of the elector therefor at the time it was granted. His vote may, however, be challenged at the polls, or on contest of the election, for any other cause which makes it an illegal vote."

(h) *Issuance of Bonds Will be Confiscation of Property and the Taking Thereof Without Due Process of Law.*—Counsel for the plaintiffs, in their printed arguments, lay great stress on this point, but it will be noted that practically all the authorities offered in support of the contention relate to special assessments laid against property on account of special benefits to be derived from improvements made out of the proceeds of the tax levy, as in the case of taxing abutting property for street improvements. It seems to me that this line of cases has no application to the point at issue. Undoubtedly the establishment of a water and sewer system in a town would be a great benefit to the persons living in the town. Among other things, it would reduce the cost of insurance on property, it would improve the health conditions in the community, and would be an undoubted convenience to all the citizens of the town requiring water for domestic and other purposes. The court will take judicial knowledge of the fact that the establishment of such improvements would require for a term of years the imposition of a tax levy to

pay for them, but it by no means follows, as a necessary conclusion, that the imposition of such tax would amount to a confiscation of property. Besides, that is a question which the voters of the town were called upon to decide by ballot, and the overwhelming majority of the voters participating in said election have declared themselves in favor of establishing the water and sewer systems and issuing bonds to pay therefor. "Every reasonable presumption will be indulged in to sustain an election." *Rawl v. McCown, supra.*

Upon a full consideration of the case, I am of the opinion that an injunction *pendente lite* should not be issued and that the restraining order heretofore passed should be dissolved. It is so ordered.

*Messrs. Crouch & Ramage, J. Wm. Thurmond,* and *Jeff D. Griffith,* for appellants,

*Messrs. C. S. Montieth, Jr., George Bell Timmerman,* and *C. T. Graydon,* for respondents,

November 13, 1928.

The opinion of the court was delivered by MR. CHIEF JUSTICE WATTS.

For the reasons assigned by his Honor, Judge DeVore, it is the judgment of this Court that the judgment of the Circuit Court be affirmed.

MESSRS. JUSTICES COTHRAN, BLEASE, STABLER, and CARTER concur.

MR. JUSTICE BLEASE (concurring) : Many of the issues passed by the late Judge DeVore in this case were decided in the recent case of *Hunter v. Town of West Greenville*, 146 S. C., 338, 144 S. E., 62, and that case sustains the holdings of the circuit Judge.